UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHYLLIS JAGER,<br><br>         Plaintiff,<br><br> -against-<br><br>DOORDASH, INC.,<br><br>         Defendant. | Civil Action No.: 7:24-cv-09195<br>**COMPLAINT** |

  Plaintiff Phyllis Jager ("Jager"), by and through her attorneys, Tarter Krinsky & Drogin LLP, as and for its Complaint against Defendant DoorDash, Inc. ("DoorDash"), alleges as follows:

### NATURE OF THE ACTION

  1. This is an action for breach of contract and declaratory relief. DoorDash has retaliated against Jager in response to her raising valid concerns about DoorDash's security practices—or lack of security practices. Although Jager offered to work with DoorDash to improve its security practices, DoorDash has ignored that offer and instead wrongfully terminated its contract with her.

### THE PARTIES

  2. Jager is an individual residing in and domiciled in Orange County, New York.

  3. DoorDash is a Delaware corporation with a principal place of business located at 303 2nd St., San Francisco, CA 94107.

### JURISDICTION AND VENUE

  4. This Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Jager and DoorDash and the

1

amount in controversy exceeds $75,000.  Jager is a citizen of, and is domiciled in, New York, while DoorDash is a citizen of, and is domiciled in, Delaware and California.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims at issue occurred in this judicial district, and pursuant to the forum selection clause in the Consumer Terms and Conditions agreement between Jager and DoorDash, which provides that any court suit between the parties must be brought "in the United States District Court for the District in which you reside if you are not a California citizen or resident."  Jager resides in Orange County, New York, which is within this District.

## FACTS

6.      DoorDash is the dominant online food delivery service in the U.S. market, by many accounts holding greater than a 60-percent share of the market.

7.      Such dominance has resulted in the near-ubiquitous presence of "Dashers" (the term used for DoorDash delivery drivers) in our streets and our restaurants.

8.      But not just Dashers, because they routinely are accompanied by others during deliveries.

9.      It is well-known to DoorDash and its users that third parties are commonly present in a Dasher's vehicle when the Dasher is making a DoorDash delivery.

10.     But there is a significant difference between these Dashers and non-Dashers: only the former receive background checks.

11.     Another difference exists: DoorDash is only aware of the Dashers who are registered in its system to provide deliveries.  The non-Dashers who may accompany Dashers are effectively invisible to DoorDash, as they are not monitored or recorded by DoorDash.

12. While DoorDash touts that it runs background checks on its Dashers, it does not do so for the third parties who accompany the Dashers.

13. DoorDash also does not exercise any control over those third parties, such as by requiring Dashers to identify to DoorDash and/or to consumers the identities of third parties present with the Dashers during deliveries, by requiring Dashers to operate without third parties being present, and/or by requiring that they participate in the same safety measures that apply to Dashers, such as required background checks, to ensure that these third parties do not pose a risk to DoorDash consumers.

14. In addition, DoorDash does not exercise sufficient control over its Dashers to ensure they are the ones delivering the orders.

15. When an order is placed in the DoorDash application, the application informs the user of the identity of the Dasher who will be delivering the order.

16. But Jager repeatedly has had orders delivered by persons who clearly and visibly are not the Dasher identified by the application, e.g., the actual delivery person is of a different gender and/or overall general appearance than the Dasher which the application claims is delivering the order.

17. Jager is the Chief Executive Officer of zuMedia, Inc. ("zuMedia"), a company headquartered in New York.

18. zuMedia maintains a think tank located in a set of offices in Monroe, New York.

19. Jager regularly orders meals using DoorDash to provide meals for zuMedia's employees at the Monroe offices as well as the many contractors who provide maintenance, construction and landscaping services at and around these offices. In fact, Jager believes she, on behalf of zuMedia, may be among DoorDash's most active users (by volume and order size) as,

using food delivered by DoorDash, zuMedia regularly feeds approximately 150 people each working day. Since 2021, these orders have totaled, upon information and belief, approximately $2 million.

20. The regular deliveries to the Monroe offices have afforded Jager a prime opportunity to observe the workings of DoorDash, both the good and the bad.

21. While the convenience of food deliveries is appreciated, the risks DoorDash imposes on Jager, zuMedia's employees, and members of the public in general, are substantial.

22. It is routine for Dashers to photograph deliveries as proof orders were completed. But there appear to be few to no controls regarding those photographs.

23. Dashers (or the third parties in the vehicles with them) are free to take as many photographs of the delivery locations as they wish, and to do with those photographs as they please.

24. Jager and others at zuMedia's Monroe offices regularly have observed Dashers, and the third parties traveling with them, taking photographs of the vehicles that are located in the driveway of the offices—which driveway and vehicles are not immediately adjacent to the delivery location. Even the photographs showing the deliveries routinely record much more than the deliveries themselves, often needlessly depicting zuMedia's employees, large areas of the Monroe office premises including, but not limited to, security systems such as door locks, key pads, smart doorbells, and cameras.

25. There is no reason for any of these types of photographs to be taken let alone retained following a delivery, but DoorDash has no known policy requiring Dashers to dispose of photographs (or to verify said disposal), or of requiring Dashers to engage in proper practices to avoid misuse regarding the taking and retention of the photographs.

26. These photographs clearly are unnecessary to the delivery process. They would be concerning even if they were being taken only to satisfy the prying curiosity of a Dasher. But the photographs are especially concerning to Jager (and presumably to other DoorDash users who become aware of these practices) because their more likely purpose is the surreptitious collection by Dashers and their accomplices of information about zuMedia's premises and vehicles.

27. Such practices place Jager and every employee of zuMedia at risk, as well as every other user of DoorDash and the persons who work or reside at DoorDash delivery locations.

28. In pre-DoorDash days, a car full of people quietly photographing a residence or office, particularly at night, would be immediately suspicious, as it would be believed they were "casing" the home as a potential burglary target in the future.

29. The rise of DoorDash and other delivery services has made it less unusual to see strangers taking photographs of a home or office, but in so doing it has also made it much simpler for malicious persons to take advantage of this development to openly do now what previously would have to have been done in the shadows.

30. While such persons can engage in these acts without being associated with Dashers, the prevalence of DoorDash deliveries gives such malicious persons easy opportunities to gain access to targets of interest.

31. These opportunities are magnified when third parties ride along with Dashers, or when those third parties are the ones conducting deliveries under the guise of a Dasher, persons who are not subject to background checks by DoorDash and whose identities are unknown to DoorDash.

32. The photographs taken by Dashers and the persons accompanying them on deliveries can be used for purposes beyond burglary and vehicle theft. They can be used in

connection with the abduction of children. This is a world in which nefarious parties place literal orders on the dark web for children specifying age, gender and physical requirements, and those fulfilling those orders stalk potential targets until the ideal victim is identified.

33. But Jager's concern, and most peoples' concerns, are not limited to such specific crimes.

34. DoorDash, by having no policies regarding the retention and use of photographs taken by Dashers and enabling unknown third parties with unknown intentions unfettered opportunities to collect private information in innocuous ways, poses a substantial risk of harm to consumers, their children, and their property.

35. On November 6, 2024, Jager sent a notice to DoorDash advising it of her intent to initiate an informal dispute resolution conference with DoorDash (the "November 6 notice").

36. This is the initial step required by the DoorDash Consumer Terms and Conditions, an agreement between DoorDash and each user of its services, including Jager, when the consumer seeks to raise a dispute with DoorDash that may lead to legal action. A copy of the Consumer Terms and Conditions is attached as Exhibit A.

37. Under the Consumer Terms and Conditions, a user cannot commence litigation against DoorDash for at least 60 days after sending the notice of intent to initiate an informal dispute resolution conference and until after the conference is held.

38. The purpose of this initial step, and the required waiting period, is for the parties to try to work together to resolve the dispute without the need for costly litigation.

39. DoorDash itself states in the Consumer Terms and Conditions that, "You and DoorDash agree that good-faith informal efforts to resolve disputes often can result in a prompt, low-cost, and mutually beneficial outcome."

40. Unfortunately, only Jager has acted in good faith.

41. In the November 6 notice, Jager described the risks discussed above and told DoorDash that she wanted to work with it to investigate various approaches that might reduce those risks, including requiring photographs to be taken through the DoorDash app (and for them to expire a reasonable time after the delivery is made), requiring all occupants of a Dasher's vehicle to be registered with and vetted by DoorDash, and/or adding information to the DoorDash app so that customers have means of tracking who has been to their home and when.

42. Jager offered to work with DoorDash to investigate whether these and other approaches might reduce the risks described above in a cost-effective manner.

43. But DoorDash did not accept this opened hand of cooperation from a power user of its services.

44. Instead, DoorDash has sought to avoid addressing the dispute by simply terminating Jager's account and blocking her from receiving services by cancelling her DoorDash account on a pretextual basis.

45. On or about November 18, 2024, Jager, while on the phone with a DoorDash customer service representative, discovered that DoorDash had erased from her account information relating to the history of purchases made through her DoorDash account since 2021. According to the DoorDash representative, Jager's account profile showed no purchases prior to November 16, 2024.

46. Notably, DoorDash, since at least 2021, has not provided a means for its users to review their purchase history online.

47. On or about November 21, 2024, DoorDash suddenly contacted Jager—but not to discuss her November 6 notice seeking an informal dispute resolution conference.

48. Instead, DoorDash demanded that Jager verify the zuMedia corporate credit card listed on her DoorDash account for payments by providing a photograph of her Bank of America debit card. Bank of America is the issuer of the Visa credit cards used with Jager's DoorDash account.

49. To the best of Jager's knowledge, DoorDash does not have a policy regarding its retention and use of photographs of debit cards provided by its users. This is incredibly risky, because a person armed with a consumer's debit card number has the ability to drain the consumer's entire bank account if that person can determine the PIN associated with the debit card.

50. zuMedia's Bank of America account often has millions of dollars in it.

51. As Jager orders meals for zuMedia personnel on her own DoorDash account, she uses either her zuMedia corporate credit card or a personal credit card to pay for those orders.

52. But upon Jager providing a photograph of her zuMedia debit card and otherwise verifying the corporate credit card she uses for the account, DoorDash informed her it was cancelling her account because, according to DoorDash, she was fraudulently using zuMedia's credit card which, according to DoorDash, does not belong to her.

53. This was blatantly false, as the zuMedia corporate credit card is issued in Jager's name and Jager is easily identifiable as the CEO of zuMedia.

54. Jager has been using her DoorDash account to order meals for zuMedia's Monroe offices since at least 2021.

55. During that entire time, Jager has paid for the DoorDash orders using her zuMedia corporate credit card or her personal credit card, both of which have been on file with DoorDash. While the credit card numbers associated with these cards have changed over the years, the accounts have not. The zuMedia card has always been associated with the same Bank of America

Visa account, and Jager's personal card has always been associated with the same Bank of America Visa account.

56. DoorDash never questioned or raised any issue with the credit cards used by Jager, nor did it complain about the lucrative business it was receiving from Jager, until Jager sent the November 6 notice. DoorDash then cancelled Jager's DoorDash account. The unexpected, pretextual cancellation of Jager's account with DoorDash has had a costly impact on her as the CEO of zuMedia, both to her reputation as well as to her ability to ensure that the meals provided to zuMedia personnel remain one of the benefits of working for the company. Jager, unlike DoorDash, has not been able to shirk her responsibilities and simply cancel the food orders.

## AS AND FOR A FIRST CAUSE OF ACTION
(Breach of Contract)

57. Jager restates the allegations set forth in paragraphs 1 through 56 above as if fully set forth herein.

58. The DoorDash Consumer Terms and Conditions are, as expressly stated therein, a legal agreement between DoorDash and Jager, who is a consumer using DoorDash's services. *See* Exhibit A.

59. The Consumer Terms and Conditions provide that Jager may use DoorDash's services unless she violates the rules and prohibitions specified in Sections 5, 7, 8, 13, and 22.

60. Jager has not violated any of the rules and prohibitions specified in the Consumer Terms and Conditions.

61. Jager has performed all her obligations under the Consumer Terms and Conditions.

62. DoorDash has breached the Consumer Terms and Conditions by falsely claiming that Jager is fraudulently using the credit card of another person.

9

63. DoorDash knows its claim is false, as it has been informed that the credit card on Jager's DoorDash account was issued to Jager.

64. Further evidence of DoorDash's knowing falsity is that Jager has used her zuMedia corporate credit card on her account, charging substantial amounts, for at least three years without any issue being raised by DoorDash.

65. DoorDash only raised an issue now because Jager sent the November 6 notice.

66. While DoorDash claims in Section 22 of the Consumer Terms and Conditions that it has discretion to terminate any user's account, DoorDash is required to exercise that discretion in good faith.

67. DoorDash's bad-faith, pretextual termination of Jager's account on November 21, 2024, breached the Consumer Terms and Conditions.

68. As a direct and proximate result of DoorDash's breach, Jager has suffered and will suffer monetary damages in an amount to be determined at trial, but in an amount believed to be at least $100,000.

**AS AND FOR A SECOND CAUSE OF ACTION**
(Breach of the Covenant of Good Faith and Fair Dealing)

69. Jager restates the allegations set forth in paragraphs 1 through 56 above as if fully set forth herein again at length.

70. The DoorDash Consumer Terms and Conditions are, as expressly stated therein, a legal agreement between DoorDash and Jager, who is a consumer using DoorDash's services. See Exhibit A.

71. As such, the Consumer Terms and Conditions imposed upon the parties thereto a duty of good faith and fair dealing in the performance and enforcement of such contract.

72. DoorDash's duty of good faith and fair dealing included the obligation to exercise in good faith its discretion in determining whether to terminate a user's account.

73. This obligation is imposed by law.

74. This obligation is also implied from the extensive set of rules and prohibitions (in Sections 5, 7, 8, 13, and 22) that the Consumer Terms and Conditions states may be the ground of termination, as the existence of these rules and prohibitions indicate that DoorDash will not terminate a user's account except in good faith and when the user has violated the Consumer Terms and Conditions.

75. DoorDash breached its duty of good faith and fair dealing by terminating Jager's account in retaliation for her sending the November 6 notice.

76. DoorDash's knowingly false, pretextual ground for terminating Jager's account breached its duty of good faith and fair dealing.

77. As a direct and proximate result of DoorDash's breach, Jager has suffered and will suffer monetary damages in an amount to be determined at trial, but in an amount believed to be at least $100,000.

## AS AND FOR A THIRD CAUSE OF ACTION
(Defamation)

78. Jager restates the allegations set forth in paragraphs 1 through 56 above as if fully set forth herein again at length.

79. On November 21, DoorDash called Jager and demanded that she verify the credit card listed on her DoorDash account for payments.

80. As Jager orders meals for zuMedia personnel on her own DoorDash account, she uses her zuMedia corporate credit card, issued in her name or her own personal credit card, to pay for those orders.

81. But upon Jager verifying the card she uses for the account, DoorDash informed her it was cancelling her account because, according to DoorDash, she was fraudulently using a card that does not belong to her.

82. Upon information and belief, DoorDash subsequently contacted zuMedia's and Jager's credit card issuer, Bank of America, and other food delivery services, including Uber Eats and Grubhub, and informed those services that Jager was fraudulently using a credit card that does not belong to her. This caused those services to cease permitting Jager to use both her zuMedia corporate and personal credit cards to place orders with them.

83. Upon information and belief, DoorDash has made Dashers aware that Jager's DoorDash account is no longer operational.

84. Prior to Jager's call with DoorDash, Jager routinely had successfully used her zuMedia corporate and personal credit cards to place orders with Uber Eats and Grubhub food delivery services.

85. But since her call with DoorDash, Jager has been unable to use her zuMedia corporate or personal credit cards to place orders with any of those food delivery services.

86. There has been no change to Jager's accounts with those food delivery services since well before the call with DoorDash. The only reason for those services to suddenly decline Jager's card is that DoorDash told them and/or Bank of America that Jager was using her credit card to commit fraud.

87. Upon information and belief, DoorDash was, at a minimum, negligent in making the false statements to Bank of America, Uber Eats, Grubhub and the other food delivery services because, among other things, DoorDash knew that the zuMedia corporate credit card was properly issued in Jager's name and that it had been used by Jager to place orders on DoorDash since 2021.

12

88. DoorDash's false statements to Bank of America, Uber Eats and Grubhub are not protected by any privilege.

89. DoorDash acted with actual malice or with reckless disregard for the truth of the matter contained in DoorDash's false statements to Bank of America, Uber Eats, Grubhub and the other food delivery services.

90. False statements that are directed to the honesty, efficiency, or other business character traits amount to defamation per se.

91. Here, DoorDash has published statements that Jager was committing fraud.

92. DoorDash's false statements constitute defamation per se.

93. Additionally, Jager incurred special harm, including, but not limited to, suspension from placing food orders with Uber Eats and Grubhub and damage to Jager's reputation.

94. Jager is entitled to damages, costs, and fees as allowed by law.

95. As Jager has suffered injury and, unless DoorDash is enjoined from such activity, will continue to suffer injury.

96. At all relevant times, DoorDash knew that Jager was authorized to use her credit cards.

97. As Jager orders meals for zuMedia personnel on her own DoorDash account, she uses her zuMedia corporate and personal credit cards to pay for those orders.

98. But upon Jager verifying the corporate card she uses for the account, DoorDash informed her it was cancelling her account because, according to DoorDash, she was fraudulently using a card that does not belong to her.

99. Jager's good reputation is extremely important.

100. Jager is the CEO of zuMedia. zuMedia develops innovative technologies imagined to serve and service the public, including fatSu and PalmPens, which are products intended to generate revenue that will sustain zuMedia's humanitarian efforts, DMDb.com, which offers revenue-generating streams that will put money directly into the pockets of the American public as well as the global world beyond, and the patented Backskin advertising technology, which stands to revolutionize online advertising by allowing internet users to earn a living wage by utilizing their online profiles.

101. As the CEO of a company that has received a multitrillion dollar valuation and intends to dedicate a significant portion of its profits to the public good, the damage to Jager's reputation caused by DoorDash's conduct is substantial.

102. As a direct and proximate result of DoorDash's defamatory conduct, Jager has suffered and will suffer monetary damages in an amount to be determined at trial, but in an amount believed to be at least $10,000,000.

103. By reason of DoorDash's egregious and improper conduct, Jager is further entitled to punitive damages in an amount to be determined at trial, but in an amount not less than $100,000,000.

**AS AND FOR A FOURTH CAUSE OF ACTION**
(Declaratory Judgment – 28 U.S.C. § 2201)

104. Jager restates the allegations set forth in paragraphs 1 through 56 above as if fully set forth herein again at length.

105. Jager contends that DoorDash's termination of her account was unlawful, made on a pretextual ground, and thus in violation of the DoorDash Consumer Terms and Conditions.

106. DoorDash contends that its termination of Jager's account complied with the DoorDash Consumer Terms and Conditions.

107. Jager further contends that DoorDash is misusing the 60-day period that Jager is required to wait following her service of a notice of intent to an initiate an informal dispute resolution conference to take retaliatory action against Jager.

108. While the Consumer Terms and Conditions requires DoorDash to have made good-faith efforts to resolve the dispute with Jager, DoorDash has not made any good-faith efforts to resolve the dispute, nor, indeed, any efforts at all.

109. DoorDash has not contacted Jager concerning her dispute in the nearly four weeks since she served the November 6 notice.

110. Instead, DoorDash has terminated Jager's account with DoorDash on pretextual grounds and a false accusation of fraud.

111. DoorDash's conduct has breached the dispute resolution procedure DoorDash imposes on its users.

112. Jager contends that, by virtue of DoorDash's breach, she has been relieved of her obligation to comply with the dispute resolution procedure in Section 14 of the Consumer Terms and Conditions, including the requirements to attend an informal dispute resolution conference, to have to wait until after that conference to pursue litigation against DoorDash, and then to have to pursue that litigation by arbitration.

113. Upon information and belief, DoorDash will contend that it has complied with its obligations under the Consumer Terms and Conditions, it has not misused the 60-day waiting period, and it has not engaged in any improper action toward Jager.

114. An actual and justiciable case or controversy therefore exists between DoorDash and Jager regarding the status of Jager's account and whether Jager has to comply with DoorDash's dispute resolution procedure.

115. Jager respectfully requests that this Court enter a judgment declaring that Jager's account with DoorDash shall be restored to active status and may not be terminated by DoorDash in the future unless it demonstrates Jager has violated DoorDash's rules and prohibitions in Sections 5, 7, 8, 13, and 22 of the Consumer Terms and Conditions.

116. Jager respectfully requests that this Court enter a judgment declaring that Jager is not further required to comply with the DoorDash dispute resolution procedure in Section 14 of the Consumer Terms and Conditions, including that Jager is not required to attend an informal dispute resolution conference with DoorDash, is not required to wait until that conference before commencing litigation against DoorDash, and is not required to arbitrate its dispute with DoorDash but may proceed with her claims in this Court

## **DEMAND FOR JURY TRIAL**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Jager respectfully demands a jury trial of all issues triable to a jury in this action.

**WHEREFORE**, Jager requests that the Court enter judgment in favor of Jager and against DoorDash, granting the following relief:

1. Awarding compensatory damages on the First Cause of Action, in an amount to be determined at trial, but in an amount not less than $100,000;

2. Awarding compensatory damages on the Second Cause of Action, in an amount to be determined at trial, but in an amount not less than $100,000;

3. Awarding compensatory damages on the Third Cause of Action, in an amount to be determined at trial but believed to be at least $10,000,000;

4. Awarding punitive damages on the Third Cause of Action in an amount to be determined at trial but not less than $100,000,000;

5. Declaring that Jager's account with DoorDash shall be restored to active status and may not be terminated by DoorDash in the future unless it demonstrates Jager has violated DoorDash's rules and prohibitions in Sections 5, 7, 8, 13, and 22 of the Consumer Terms and Conditions;

6. Declaring that Jager is not further required to comply with the DoorDash dispute resolution procedure in Section 14 of the Consumer Terms and Conditions, including that Jager is not required to attend an informal dispute resolution conference with DoorDash, is not required to wait until that conference before commencing litigation against DoorDash, and is not required to arbitrate its dispute with DoorDash but may proceed in this Court;

7. Awarding Jager the costs and disbursements of this action and, to the extent permitted by law, her attorney's fees;

8. Awarding pre- and post-judgment interest at the maximum rate allowed by law; and

9. Granting such other and further relief as the Court deems just and proper.

Dated: December 2, 2024

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Plaintiff*

By: _____
   Joel H. Rosner
   Iris Velasquez
1350 Broadway, 11th Floor
New York, New York 10018
Tel (212) 216-8000
Fax (212) 216-8001
jrosner@tarterkrinsky.com
ivelasquez@tarterkrinsky.com